IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

EDNA J. TULLIUS,

      Plaintiff,

v.                          Civil Action No. 5:15CV149
                                         (STAMP)
SILGAN PLASTICS CORPORATION,

      Defendant.


## MEMORANDUM OPINION AND ORDER
### GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PORTIONS OF PLAINTIFF'S RESPONSE

### I.  Procedural History

The pro se[1] plaintiff, Edna Jo Tullius, filed a complaint in the Circuit Court of Ohio County, West Virginia, on August 11, 2015.  In her complaint, the plaintiff alleges that the defendant, her former employer Silgan Plastics Corporation, discriminated against her in violation of the West Virginia Human Rights Act ("WVHRA"), West Virginia Code § 5-11-1 et seq., by terminating her employment at the conclusion of her six-month short-term disability leave.  Specifically, the plaintiff states claims for (1) failure to accommodate disability, (2) discrimination on the basis of disability, and (3) retaliatory discharge, all in violation of the WVHRA, which uses the same framework as Title VII.  The defendant properly removed the case to this Court on November 23, 2015, on

---

[1]The pro se plaintiff has informed the Court throughout the course of this litigation that she will get an attorney but has not done so up until this point.

the basis of diversity jurisdiction. On January 12, 2017, the defendant filed a renewed motion for summary judgment. The Court had previously denied without prejudice the defendant's first motion for summary judgment because discovery motions were still pending before the magistrate judge. The Court heard oral argument on the renewed motion for summary judgment, during which both sides offered their positions on the matter.

At issue in this memorandum opinion are (1) the defendant's renewed motion for summary judgment (ECF No. 101) and (2) the defendant's motion to strike portions of the plaintiff's response to the defendant's renewed motion for summary judgment (ECF No. 108). For the reasons set forth below, the defendant's motion for renewed summary judgment and its motion to strike portions of the plaintiff's response are both granted.

## II. Facts

### A. The Defendant's Statement of Uncontroverted Material Facts

The Court has reviewed the defendant's statement of uncontroverted material facts in support of its motion for renewed summary judgment and compared it to the exhibits in the record. Pursuant to this review, the Court finds that the defendant's statement of uncontroverted material facts is correct and, thus, the Court hereby adopts them. Additionally, the plaintiff's objections to the defendant's statement of uncontroverted material facts are without merit because they are only argument with no

reference to any exhibits.  Those facts, adopted by the Court, are as follows:

1.    Silgan Plastics is a manufacturer of plastics in North America and operates twenty manufacturing plants in various locations across North America, including its manufacturing facility located in Triadelphia, West Virginia.  Ex. No. 1.

2.    Plaintiff Edna Jo Tullius (formerly known as Edna Jo Redman) (hereinafter, "Plaintiff") began her employment with Silgan on June 4, 1997, as a production laborer operating a forklift.  Ex. No. 1; Ex. No. 2, at 44-45.

3.    Plaintiff was promoted to the position of Injection Operator and remained in that position for the remainder of her employment with Silgan.  Ex. No. 1.

4.    As an Injection Operator, Plaintiff was responsible for operating a room usually containing three to five plastic molding machines weighing up to 300 tons each.  Ex. No. 1.

5.    Within her assigned room, Plaintiff was responsible for performing quality checks, packaging parts, moving boxes, shipping boxes, printing labels, performing minor repairs on machines, and responding to the machine's warning indicators before the machine goes down.  Ex. No. 2, at 47-48.

6.    Plaintiff testified that her work at Silgan was dangerous, that there are risks present in working with large

machines at Silgan, and that the position required that she was careful to avoid injury. Ex. No. 2, at 48-49.

7.    Silgan's attendance policy, set forth in its Employee handbook, states that "[a]n absence is defined as a period of one, two, or three consecutive days being out for the same reason," and "[i]f one incident is three (3) days or longer, you must return with a note from a medical provider." Ex. No. 3, at 42.

8.    Silgan's Short Term Disability Policy states "Silgan Plastics LLC (the "Company") provides you Short Term Disability pay ("STD pay") if you are temporarily unable to work because of a disability . . . [a]t the end of your short-term disability period, if you have not returned to active work with Silgan Plastics, your employment will be terminated if you fail to demonstrate that you are ready, willing, and able to work, with or without reasonable accommodation." Ex. No. 4.

9.    Plaintiff suffered from depression and anxiety issues dating back to at least 2002, for which she received treatment from psychiatric professionals and was prescribed medications including Zoloft. Ex. No. 2, at 57-58; Ex. No. 5.

10.   Plaintiff testified that she has been prescribed antidepressant medications throughout her "whole entire lifetime" but only took the medications for about a month and never refilled the prescriptions because she was "stronger-minded than that" and did not "want to rely on medications." Ex. No. 2, at 59 and 62.

11.  Beginning in March 2010, Plaintiff was placed under the care of Dr. Matthew Wood for extreme depression and anxiety.  Ex. No. 2, at 62.

12.  On March 1, 2010, Plaintiff requested time off until March 22, 2010, presenting a physician's note from Dr. Wood, who was treating Plaintiff for "major depression and anxiety."  Ex. No. 6.

13.  On March 29, 2011, Plaintiff provided Silgan with a certification of health care provider from Dr. Wood for intermittent leave under the Family and Medical Leave Act ("FMLA") for severe Psoriatic arthritis, which causes flare-ups related to stress and activity, during which symptoms included swelling and lack of motion in hands, feet, and joints preventing Plaintiff from performing work.  Ex. No. 7.

14.  On May 3, 2011, Plaintiff submitted her claim for short-term disability, describing disability as "flare ups & severe pain from arthritis causing major depression and anxiety."  Plaintiff's last day worked was April 10, 2011, and her expected return was May 20, 2011.  Ex. No. 8.

15.  On May 3, 2011, Dr. Wood provided his certification for Plaintiff's short-term disability leave, noting that Plaintiff was suffering from arthritis, anxiety, and depression.  Ex. No. 9.

16.  On June 10, 2011, Dr. Wood provided a note stating that Plaintiff was to remain on continued FMLA leave due to her medical issues.  Ex. No. 10.

17.  On July 1, 2011, Podiatrist Dr. Joseph Goodwin provided a health care certification for FMLA leave stating that Plaintiff had surgery and was on crutches for her condition beginning May 19, 2011, for which she was to remain off of work through August 31, 2011, and noting that she may require one to two days off at a time two to three times a month for flare-ups.  Ex. No. 11.

18.  On August 25, 2011, Dr. Goodwin release Plaintiff to return to full duty on August 31, 2011.  Ex. No. 12.

19.  On April 3, 2012, Plaintiff contacted Dr. Evans's office reporting that she could not straighten out her hands "no matter how she tries" and that "the pain is unbearable."  Ex. No. 13.

20.  On May 30, 2012, Plaintiff provided a certification of health care provider for FMLA leave from Dr. Catherine Evans stating that Plaintiff suffered from possible psoriatic, likely degenerative, arthritis which resulted in episodic flare-ups causing incapacitating pain and decreased ability to move; also noted that Plaintiff might have lupus and was undergoing evaluation for that condition.  During the flare-ups, Dr. Evans stated that Plaintiff was totally disabled for two days at a time one to two times per month.  Ex. No. 14.

21.  Plaintiff testified that, throughout the times of her various leaves of absence, she lied, "faked," and exaggerated her physical symptoms to her various physicians in order to obtain their consents so that she could take disability leaves.  Ex. No. 2, at 96, 107, 109, 113, 116-20, 123, 125, 142-45, 185, 204, and 206.

22.  On July 30, 2012, after seeing Plaintiff, Dr. Evans noted that Plaintiff continued to have "a lot of anxiety."  Ex. No. 13.

23.  On August 1, 2012, Plaintiff began a leave of absence. Ex. No. 15.

24.  Plaintiff executed a Statement of Claim for Short Term Disability on August 12, 2012, showing a last date worked on August 1, 2012, and stating that she had been "diagnosed with Lupus need further testing also having extreme fatigue due to white blood cell count being low"; her anticipated return date was listed as "4 weeks."  Ex. No. 15.

25.  To substantiate Plaintiff's request for leave, Dr. Seaman provided a physician's short-term disability statement for Plaintiff listing a disability beginning date of May 17, 2012 and indicating that Plaintiff could return on December 1, 2012, to modified duty requiring that she "avoid repetitive use of hands," which he signed on August 31, 2012.  Ex. No. 16.

26. On September 11, 2012, Dr. Seaman provided a certification of health care provider for FMLA leave for Plaintiff

in which he described her condition as osteoarthritis and mixed connective tissue disease, which, having begun in 2006, he described as being of "indefinite" duration and as rendering her unable to perform "repetitive use of hands standing walking prolonged periods," as well as directing a reduced work schedule of two hours per day, two days per week for an indefinite period of time based upon his anticipation of flare-ups three times per week for three days per episode during which "pain and suffering will preclude any work activity." Ex. No. 17.

27. October 18, 2012: Plaintiff tells Dr. Evans that she has presented FMLA paperwork to Dr. Seaman to validate her leave but that he is taking too long and requests that Dr. Evans provide a note regarding her need for continued FMLA leave, which Dr. Evans did, noting that Plaintiff "continues to need FMLA time off due to her Lupus." Ex. No. 18.

28. Plaintiff was seen by Dr. Ghodrial on October 29, 2012, at which time she told him that she had problems since losing her job due to issues on the job, despite the fact that Plaintiff was still employed by Silgan at that time, and during which visit Plaintiff was diagnosed with bipolar disorder. Ex. No. 19.

29. November 14, 2012: Plaintiff followed up with Dr. Evans who noted diagnoses of anxiety, depression, and bipolar disorder. Records of Dr. Evans.

30.   Plaintiff disagreed with Dr. Ghodrial's diagnosis, so she "declared [herself] better," meaning that she elected not to follow his medical advice, to continue taking the medication he prescribed, or to continue allowing him to treat her.  Ex. No. 2 at 187.

31.   Also on December 27, 2012, on a patient phone call record, Dr. Evans noted that Plaintiff had told her she had called every psychiatrist on a list that Dr. Evans had provided but had been unable to obtain an appointment and was waiting to hear back for an appointment.   On that same note, Dr. Evans denied Plaintiff's request to fill a prescription for Ativan because "she will get addicted," and noted that Plaintiff was not on any medication for anxiety and that she "cries a lot," along with a question as to who she could see for a psychological evaluation, noting "I have tried different meds for her before without success – needs psych help go to emergency services if needed."   Ex. No. 13.

32.   On that same date, December 27, 2012, Dr. Evans released Plaintiff to return to work.   Ex. No. 20.

33.   Plaintiff showed up for work on January 2, 2013, but was not allowed to return because her drug testing results – passage of which is required in order to return to work from short-term disability leave – had not yet been received.   Ex. No. 2 at 128.

34.   On January 10, 2013, Dr. Evans revoked Plaintiff's prior release and ordered her to return for reevaluation.  Ex. No. 21.

35.   On January 30, 3013, Plaintiff returned to work from her leave of absence.  Ex. No. 1.

36.   On February 13, 2013, Plaintiff's sixth day back from her leave of absence, she reported to work at 1:49 p.m., more than six hours late for her shift.  Ex. No. 1.

37.   On February 14, 2013, a child abuse action instituted by Plaintiff, acting pro se, against her ex-husband, was thrown out of court, causing her to seek a loan against her retirement account and causing her significant distress.  Ex. No. 22.

38.   On February 15, 2013, Plaintiff's seventh day after returning from leave, Plaintiff needed to be relieved at work while she cried at work for approximately 2.5 to 3 hours, during which time someone else was required to perform the functions of her position.  Ex. No. 22.

39.   On February 18, 2015, Plaintiff told Human Resources Manager Debbie Turziano that she considered shooting herself in the head the day before due to a number of stresses in her life, after which Ms. Turziano instructed Plaintiff to call the employee assistance hotline number or else she may be forced to go on leave. Ex. No. 23.

40. On February 19, 2015, Plaintiff began a leave of absence, having worked only eight shifts since returning from her prior six-month leave of absence. Ex. Nos. 1 and 24.

41. Plaintiff testified that, in addition to the other sources of stress and anxiety described herein, her teenage nephew, David, also died of cancer on or about February 27, 2013, causing her extreme sadness, depression, insomnia, and anxiety, and she attributed frequent, prolonged crying spells around this time to her grief. Ex. No. 2, at 98-99, 114-15, 131, 148, 168, 178-79, 185, 252, and 257.

42. On March 5, 2013, Dr. Evans provided a physician's statement for Plaintiff's short-term disability application stating that Plaintiff suffers from severe depression, was unable to function at work, suffered frequent crying spells, insomnia, and fatigue, and recommending counseling and medication, noting that she had a psychiatric appointment on March 14, 2013, and stating an expected return to work date of August 1, 2013. Ex. No. 25.

43. Plaintiff testified that she believed that she had attended that appointment but had "never followed up with any doctors." Ex. No. 2 at 178.

44. Plaintiff testified that she had not told Dr. Evans that she was unable to function at work but rather that was Dr. Evans's finding. Ex. No. 2 at 180.

45.   Also on March 5, 2013, Dr. Evans provided a certification of health care provider for FMLA leave for Plaintiff stating that Plaintiff's disability began on February 4, 2013, was expected to last six months, stating that Plaintiff "had numerous appointments in the past for mood disorder before this acute flare," noting again that Plaintiff had a psychiatric appointment on March 14, 2013, that Plaintiff was unable to perform her job, that she was "temporarily and totally incapacitated," that she suffered from "severe depression; frequent crying spells; insomnia, fatigue; unable to function at work," and anticipating complete incapacitation through July 31, 2013, during which time she was to be excused from work.   Ex. No. 26.

46.   On March 12, 2013, Plaintiff provided a Statement of Claim for Short Term Disability Benefits describing her disability as "severe depression due to too many stressful things to deal with at once[:] divorce, nephew passing away, health deteriorating, foundation on house cracked, husband has child abuse against [her 6-year-old] son, 2 animals died." Ex. No. 24.

47.   On April 22, 2013, Dr. Evans provided an attending physician statement for Plaintiff's long-term disability insurance application to Metropolitan Life Insurance Company (hereinafter, "MetLife"), in which she stated that Plaintiff was diagnosed with depression, anxiety, bipolar disorder, ADHD, and arthritis, causing frequent crying episodes, not sleeping, inability to concentrate,

and fatigue; noting "recent exacerbation of symptoms – deficient social situation" and "further medication adjustment and work with counselor and psychiatrist" was recommended.  Dr. Evans wrote that Plaintiff was unable to engage in stress situations, that her husband had left her and that her son had significant behavioral issues.  Dr. Evans wrote that Plaintiff could work zero hours per day and was unable to perform her job duties due to "balance off – hands weakening – major chronic fatigue."  Where the form asked if Dr. Evans expected significant improvement in any area, she wrote "No."  Ex. No. 27.

48.  On May 8, 2013, Dr. Evans provided a note indicating that Plaintiff was to remain on FMLA leave due "to her depression."  Ex. No. 13.

49.  On June 18, 2013, Dr. Seaman executed an "attending physician's statement" for MetLife in support of Plaintiff's application for long-term disability benefits stating that she suffered from osteoarthritis, mixed connective tissue disease, and carpal tunnel syndrome, that she was able to work less than one hour per day, and that he did not suggest that she return to work in her then-present occupation.  Ex. No. 28.

50.  On June 24, 2013, Dr. Evans noted that Plaintiff had contacted her requesting a letter be faxed to Defendant indicating that she "is still off due to her illness of Lupus in her hands and her mental illness," and in response she provided a note to Silgan

recertifying Plaintiff for FMLA for "lupus and psychological problems." Ex. No. 13.

51.  On July 3, 2013, Plaintiff completed an initial interview with MetLife, the long-term disability insurance provider from whom she was at that time seeking benefits, and during that interview indicated that she was no longer taking her medications for depression because they were making her more depressed, that she was instead attending church five days per week to treat her depression, that her lupus "is so bad her hands are in the claw position and her fingertips hurt so bad they're thinking of removing them," that she could no longer wash her hair, that she could not do much housework and that she did not care much to RTW ("return to work").  Ex. No. 29.

52.  Dr. Evans's notes from August 13, 2013 indicate that Plaintiff had contacted her seeking a release to return to work and that she had declined because Plaintiff needed "a note from her psychiatrist as she is off for those reasons."  Ex. No. 13.

53.  Plaintiff testified that she requested a release to return to work from Dr. Seaman's office and spoke to his nurse, stating "she said that he was on vacation out of the country but that she couldn't see why she couldn't send me the release."  Ex. No. 2 at 269.

54.  Dr. Seaman's records and affidavit testimony show that, on August 15, 2013, Plaintiff contacted his office and requested a release to return to work on "light duty."  Ex. No. 28.

55.  Dr. Seaman's records and affidavit testimony show that he did not write a release for Plaintiff, but rather that, on or about August 20, 2013, he re-transmitted to her the MetLife form he had signed on June 18, 2013, stating that she was unable to work except for less than one hour per day and subject to extensive restriction.  Ex. No. 28.

56.  Dr. Seaman's records and affidavit testimony reflect that he never communicated directly with Silgan.  Ex. No. 28.

57.  Plaintiff testified that she stopped seeing Dr. Seaman because she did not agree with what he was saying in that he had stated that she was "100 percent totally disabled."  Ex. No. 2, at 7-38; Ex. No. 28.

58.  Plaintiff did not provide a release from a physician stating that her restrictions were lifted and that she could return to work by July 31, 2013, the anticipated date of return indicated in her FMLA certification of March 5, 2013.  Ex. No. 26; Ex. No. 1.

59.  Plaintiff did not provide a release from a physician stating that her restrictions were lifted and that she could return to work by August 1, 2013, the anticipated date of return indicated in her FMLA certification of March 5, 2013.  Ex. No. 25; Ex. No. 1.

60.  Plaintiff testified that she is aware that, in order to have returned to work at the end of the short-term disability leave in August 2013, she needed to provide a physician's release stating that she was able to return.  Ex. No. 2 at 194.

61.  Silgan never received a physician's release stating that Plaintiff was able to return to work from the leave of absence she began on February 19, 2013.  Ex. No. 1.

62.  Plaintiff was aware that if she did not present a release stating that she was able to return to work, she would be terminated pursuant to Silgan's short-term disability policy.  Ex. No. 13.

63.  Because Plaintiff had not returned by the end of her short-term disability leave, because her leave had exceeded the 26 weeks allowed by Silgan's short-term disability policy, and because she had not requested any additional accommodation, Plaintiff's employment was terminated on August 17, 2013, consistent with Silgan's policy.  Ex. No. 4; Ex. No. 30.

64.  At the time of Plaintiff's termination, Silgan believed, based upon the information provided by Plaintiff's physicians, that she was totally and completely disabled, entirely unable to perform the essential functions of her position, and unlikely ever to improve to the point where she would be able to do so.  Ex. No. 1; Ex. No. 13; Ex. No. 31.

65.   Plaintiff testified that she did not seek additional leave as an accommodation.  Ex. No. 2, at 252.

66.   Plaintiff testified that Silgan "gave [her] a reasonable accommodation but wouldn't let [her] come back."  Ex. No. 2, at 244, 246.

67.   Plaintiff explained the inconsistency between her testimonial statements that she did not want additional leave and the allegations in her Complaint stating that she did want additional leave by stating that an attorney drafted the Complaint and that "all [she] did was sign it."  Ex. No. 2, at 240-41; Ex. No. 32.

68.   Plaintiff testified that she also was not seeking any other accommodations at that time.  Ex. No. 2, at 247.

69.   Plaintiff testified that the protected activity that forms the basis of her retaliation claim was taking a medical leave of absence.  Ex. No. 2, at 256.

70.   On September 19, 2013, Dr. Seaman noted that Plaintiff suffered from "advanced degenerative changes of DIP and PIP joints and toes and that for that reasons [he] would find her totally and permanently disabled."  Ex. No. 31.

71.   Plaintiff testified that her disability was depression but that it was not a permanent disability.  Ex. No. 2, at 252-53.

72.   Plaintiff testified that she had frequently discontinued psychiatric medications but that she intended at the time of her

testimony to obtain prescriptions for psychiatric medication and remain in compliance with physician's orders regarding said medications. Ex. No. 2, at 62-63.

73. In a phone conversation with MetLife, Dr. Evans stated that, while Plaintiff might be able physically to work, "her psychiatric problems are a bigger factor than physical conditions." Ex. No. 29.

74. Dr. Seaman wrote to MetLife as late as February 21, 2014, in response to a finding by Bradley Hudson, physical therapist, subsequently adopted by MetLife, that Plaintiff could work, upon the findings of which Dr. Seaman hand-wrote comments contradicting those findings, including his medical opinion that Plaintiff could walk only occasionally and intermittently, could only "very rarely" use her hands, could only lift ten pounds frequently or twenty occasionally, and added that her medications were likely causing side effects including fatigue. Ex. No. 29.

75. Plaintiff testified that she is currently undergoing psychiatric treatment at "Northwood" for conditions including "severe anxiety and ADHD." Ex. No. 2, at 28.

76. Plaintiff testified that, after her termination, she began using street drugs. Ex. No. 2, at 116.

77. Plaintiff testified that she has recently lost other employment because of issues including praying for a coworker "in tongues" under her breath resulting in an employer believing she

was talking to herself; Plaintiff testified that she engages in this behavior "all the time."  Ex. No. 2, at 23.

ECF No. 101-1.

B. <u>The Defendant's Renewed Motion for Summary Judgment</u>

In its renewed motion for summary judgment, the defendant argues that the plaintiff cannot establish a prima facie case of failure to accommodate.  In support of this argument, the defendant asserts that the plaintiff was not a qualified person with a disability in that she could not perform her job with or without a reasonable accommodation.  Further, the defendant claims that the plaintiff admitted that she neither requested nor desired an accommodation and that no reasonable accommodation existed at the time of her termination.

The defendant next argues that the plaintiff cannot establish a prima facie case of disability discrimination because she was not a qualified individual with a disability and cannot establish that, "but for" the disability, she would not have been terminated.  The defendant asserts that the disability was not the but for cause of termination because the plaintiff's termination was the result of her exhausting her short-term disability leave and being unable to return to work as evidenced by her not obtaining a release from her physicians.  Additionally, the defendant claims that, even if the plaintiff could establish a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a

legitimate, non-discriminatory reason for her discharge. The defendant argues that it has articulated legitimate, non-discriminatory reasons that the plaintiff cannot show were pretextual because the plaintiff was unable to return to work in any capacity.

Lastly, the defendant argues that the plaintiff cannot establish a prima facie case of retaliatory discharge. In support of this argument, the defendant asserts that the plaintiff did not engage in protected activity, her termination was not sufficiently near in time to her allegedly protected activity to support an inference of retaliation, and her engagement in allegedly protected activity was not the but for cause of her termination. The defendant states that taking a medical leave of absence is not a protected activity under the WVHRA. Further, the defendant claims that the plaintiff's termination was more than six months after she began her final leave of absence and after having been on leave for over one year except for eight days of work. Additionally, the defendant argues that, even if the plaintiff could establish a prima facie case of retaliatory discharge, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's discharge. Again, the defendant argues that it has articulated legitimate, non-discriminatory reasons that the plaintiff cannot show were pretextual. The defendant states that it has established that the plaintiff was completely restricted

from work of any kind at the time of her termination. The defendant claims that the plaintiff was terminated in accordance with the defendant's policy when she was unable to return to work at the conclusion of her leave of absence.

The plaintiff filed a <u>Roseboro</u> response to the defendant's renewed motion for summary judgment. In her response, the plaintiff argues that she took several measures to try to return to work, but all her efforts failed because the defendant never had any intention of letting her return to work. The plaintiff also states that her former boss at Silgan, who was with the company for over 30 years, is willing to testify that the defendant held a meeting specifically about the plaintiff and the defendant's belief that she was a liability due to her medical conditions. The plaintiff further states that she could perform her job with no problem at the time of her termination and that the medical specialist she was sent to agreed and informed the defendant of that medical opinion through a report.

The defendant then replied to the plaintiff's <u>Roseboro</u> response. The defendant argues that the plaintiff's response fails to address the defendant's legal arguments and that it is composed of improper, irrelevant, and inaccurate statements. The defendant further asserts that the plaintiff has failed to identify any evidence that would establish that there is a genuine question regarding any material fact as to any of the arguments raised in

the defendant's renewed motion for summary judgment.  The defendant also points out that the plaintiff claims she could have worked at the time of her termination but fails to identify any valid and admissible evidence supporting the contention.

C.   The Defendant's Motion to Strike Portions of the Plaintiff's Response

In its motion to strike portions of the plaintiff's response, the defendant argues that, pursuant to Federal Rule of Civil Procedure 56(c) and (e), the Court should strike portions of the plaintiff's Roseboro response to the defendant's renewed motion for summary judgment.  The defendant states that Rule 56(c) requires the plaintiff to support an assertion that a fact is genuinely disputed by citing to particular parts of materials in the record. The defendant argues that, in portions of the plaintiff's response, the plaintiff does not support her assertions by citing to admissible evidence.  The defendant also asserts that, under Rule 56(e), the Court may consider the defendant's statement of uncontroverted material facts undisputed for the purpose of the summary judgment motion because the plaintiff did not properly support her own assertions of fact or properly address the defendant's assertions.  The plaintiff did not file a response to the defendant's motion to strike portions of the plaintiff's response.

### III.  <u>Applicable Law</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by:
>    (A)  citing to particular parts of materials in the
> record, including depositions, documents, electronically
> stored    information,    affidavits    or    declarations,
> stipulations . . . admissions, interrogatory answers, or
> other materials; or
>    (B)  showing    that    the    materials    cited    do    not
> establish the absence or presence of a genuine dispute,
> or    that    an    adverse    party    cannot    produce    admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears

the initial burden of showing the absence of any genuine issues of

material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23

(1986).  "The burden then shifts to the nonmoving party to come

forward with facts sufficient to create a triable issue of fact."

<u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir.

1991), <u>cert. denied</u>, 502 U.S. 1095 (1992) (citing <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).  However, as the

United States Supreme Court noted in <u>Anderson</u>, "Rule 56(e) itself

provides that a party opposing a properly supported motion for

summary judgment may not rest upon the mere allegations or denials

of his pleading, but . . . must set forth specific facts showing

that there is a genuine issue for trial."   <u>Anderson</u>, 477 U.S. at

256.    "The    inquiry    performed    is    the    threshold    inquiry    of

determining whether there is the need for a trial—whether, in other

words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) ("Summary judgment 'should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.'" (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

In Celotex, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   Discussion

As stated earlier, the defendant's renewed motion for summary judgment and motion to strike portions of the plaintiff's response to its renewed motion for summary judgment are at issue in this civil action.   This Court has carefully reviewed the parties' briefing of the motions and, because the plaintiff is pro se, this

Court has liberally construed the plaintiff's pleadings. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding pro se complaints to less stringent standards than formal pleadings drafted by lawyers). The two motions are discussed below in the order presented.

A. The Defendant's Renewed Motion for Summary Judgment

As a preliminary matter, the Court notes that, while the pro se plaintiff's pleadings were liberally construed, her pleadings are largely arguments unsupported by any exhibits, and several of the objections contained in her Roseboro response to the defendant's renewed motion for summary judgment are hearsay. Rule 56(e) prevents this Court from being able to consider mere arguments and hearsay in ruling on a motion for summary judgment. This issue will be further addressed in the discussion of the defendant's motion to strike portions of the plaintiff's response. Accordingly, the Court has relied on only the specific facts set forth by the parties. For the reasons set forth below, this Court grants the defendant's renewed motion for summary judgment.

1. Failure to Accommodate Disability

To show a prima face case of failure to accommodate under the WVHRA, the plaintiff must show (1) she was a qualified person with a disability; (2) the defendant was aware of her disability; (3) she required an accommodation in order to perform the essential functions of her position; (4) a reasonable accommodation existed

25

that met her needs; (5) the defendant knew or should have known of her need and of the accommodation; and (6) the defendant failed to provide the accommodation. Haynes v. Rhone-Poulenc, Inc., 521 S.E.2d 331, 332, 337 (W. Va. 1999) (citing Skaggs v. Elk Run Coal Co., 479 S.E.2d 561, 575 (W. Va. 1996)).

The plaintiff cannot make this prima facie case because she was not a qualified person with a disability. See Ranger Fuel Corp. v. West Virginia Human Rights Comm'n, 376 S.E.2d 154, 159-60 (W. Va. 1988) ("In order to determine if an individual is 'able and competent,' the employer must consider if, with or without reasonable accommodations, . . . the individual is currently capable of performing the work . . . ."); Hosaflook v. Consol. Coal Co., 497 S.E.2d 174, 179-80 (W. Va. 1997) (defining a qualified person with a disability as 'an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job in question." (citing 77 C.F.R. § 1-4.2 (1991))). She was not a qualified person with a disability because she could not perform the essential functions of her job with or without a reasonable accommodation. Rather, the plaintiff was completely restricted from work. ECF Nos. 101-28, 101-29, 101-30, and 101-33. Additionally, the plaintiff did not request an extended leave of absence at or before the expiration of the six-month short-term disability leave. ECF No. 101-4 at 64. Furthermore, the plaintiff received more than a six-month leave of

absence in total, and, given that she never identified an anticipated return date, additional leave beyond that point would not have been a reasonable accommodation. Thus, the plaintiff has failed to show a prima facie case of failure to accommodate, and summary judgment should be granted to the defendant on this claim.

    2. <u>Discrimination on the Basis of Disability</u>

To show a prima facie case of disability discrimination based on disparate treatment under West Virginia law, the plaintiff must show (1) she belongs to a protected classification; (2) the employer made an adverse decision regarding her employment; and (3) but for her protected status, the adverse decision would not have been made. <u>Conaway v. E. Associated Coal Corp.</u>, 358 S.E.2d 423, 425 (W. Va. 1986). If the plaintiff makes this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory reason for her discharge. <u>Moore v. Consol. Coal Co.</u>, 567 S.E.2d 661, 666-67 (W. Va. 2002). If the defendant satisfies this burden, the plaintiff then has the burden to prove by a preponderance of the evidence that the reasons offered by the defendant are merely pretext for unlawful discrimination. <u>Id.</u>

Like with the failure to accommodate claim, the plaintiff also cannot make a prima facie case on this claim because she is not a qualified person with a disability. Additionally, the plaintiff cannot establish that her disability was the but for cause of her

termination.    The plaintiff was terminated pursuant to the
defendant's policy because she exhausted her short-term disability
leave and was not able to obtain a release from her physicians in
order to return to work.  ECF Nos. 101-6 and 101-32.  The plaintiff
has not offered any evidence from which a reasonable trier of fact
could determine that her disability status was the but for reason
of her termination.  Thus, the plaintiff has failed to show a prima
facie case of discrimination on the basis of disability, and
summary judgment should also be granted to the defendant on this
claim.

    3.  Retaliatory Discharge

    To show a prima facie case of retaliatory discharge under the
WVHRA, the plaintiff must show (1) she engaged in protected
activity; (2) the defendant was aware of the protected activity;
(3) she was subsequently discharged; and (4) her discharge followed
her engagement in protected activities within such a period of time
that the Court can infer retaliatory motivation.    Roth v.
DeFeliceCare, Inc., 700 S.E.2d 183, 193 (W. Va. 2010).  Like with
the discrimination on the basis of disability claim, if the
plaintiff makes this prima facie case, the burden shifts to the
defendant to articulate a legitimate, non-discriminatory, non-
retaliatory reason for her discharge.  Young v. Bellofram Corp.,
705 S.E.2d 560, 565-66 (W. Va. 2010) (overruled on other grounds)
(citing Shepardstown Volunteer Fire Dep't v. State ex rel. State of

28

W. Va. Human Rights Comm'n, 309 S.E.2d 342, 352 (W. Va. 1983)).
Also like with the discrimination on the basis of disability claim,
if the defendant satisfies this burden, the plaintiff then has the
burden to prove by a preponderance of the evidence that the reasons
offered by the defendant are merely pretext for unlawful
discrimination. Id.

The plaintiff has failed to make a prima facie case of
retaliatory discrimination. The plaintiff cannot satisfy the first
requirement because she has not engaged in protected activity. See
Roth, 700 S.E.2d at 193 ("'Protected activity' under the [WVHRA]
includes opposition to a practice that the plaintiff reasonably and
in good faith believes violates the provisions of the [WVHRA].")
The plaintiff alleges that her protected activity was taking a
medical leave of absence (ECF No. 101-4 at 65), but taking a
medical leave of absence is not protected activity under the WVHRA.

Furthermore, the plaintiff also cannot show that her
termination was sufficiently near to her engagement in the
allegedly protected activity to support a reasonable inference of
retaliation. The plaintiff was terminated on August 17, 2013,
which was over six months after she began her final leave of
absence and after having been on leave for over one year except for
eight days of work. ECF Nos. 101-26 and 101-32. The plaintiff
argues that Dr. Evans's revocation of her prior release was a
result of intimidation by the defendant, but the evidence shows

that the revocation was a result of Dr. Evans's concern for her "getting hurt or hurting someone." ECF No. 101-23. The Court cannot reasonably infer that Dr. Evans was intimidated into revoking the plaintiff's release from this evidence alone, and the plaintiff does not offer any other evidence in support of the allegation. Thus, the plaintiff has failed to show a prima facie case of retaliatory discharge, and summary judgment should be granted to the defendant on this claim as well.

Lastly, even if the plaintiff did show a prima facie case of discrimination on the basis of disability or retaliatory discharge, the plaintiff's claims still fail. The claims fail because the defendant has articulated legitimate, non-discriminatory, non-retaliatory reasons for her termination, which the plaintiff cannot show were pretextual. The defendant has established that the plaintiff was completely restricted from work at the time of her termination, had exhausted her short-term disability leave, and was unable to return to work. The defendant further established that it was its policy to terminate an employee under those circumstances and that the plaintiff was aware of that policy. ECF No. 101-15. The plaintiff has not offered any evidence to show that the defendant's articulated reasons for terminating her were pretextual.

B.  <u>The Defendant's Motion to Strike Portions of the Plaintiff's</u>
<u>Response</u>

Although the plaintiff did not respond to the defendant's motion to strike portions of her <u>Roseboro</u> response, the Court nonetheless decided this motion on the merits rather than by default.  Pursuant to Rules 56(c) and (e), the Court must strike the portions of the plaintiff's <u>Roseboro</u> response objected to by the defendant.  Rule 56(c) requires the plaintiff to support an assertion that a fact is genuinely disputed by citing to particular parts of materials in the record.  In the portions of the response that the defendant objects to, the plaintiff does not support her assertions by citing to admissible evidence.  Additionally, under Rule 56(e), the defendant is correct that the Court may consider the defendant's statement of uncontroverted material facts undisputed for the purpose of the summary judgment motion because the plaintiff did not properly support her own assertions of fact or properly address the defendant's assertions.  Accordingly, the Court grants the defendant's motion to strike portions of the plaintiff's <u>Roseboro</u> response.

V.  <u>Conclusion</u>

For the reasons set forth above, the defendant's renewed motion for summary judgment (ECF No. 101) and the defendant's motion to strike portions of the plaintiff's response (ECF No. 108)

are hereby GRANTED.  It is further ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

Should the plaintiff choose to appeal the judgment of this Court to the United States Court of Appeals for the Fourth Circuit, she is advised that she must file a notice of appeal with the Clerk of this Court within 30 days after the date that the judgment order in this case is entered.  See Fed. R. App. P. 4(a)(1).

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to the pro se plaintiff by certified mail and to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:    May 8, 2017

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE